**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| TEXAS GULF BANK, N.A. | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO: 4:25-cv-4281 |
| | § | |
| GREAT AMERICAN SECURITY | § | |
| INSURANCE COMPANY; GREAT | § | |
| AMERICAN ALLIANCE INSURANCE | § | |
| COMPANY; AND ABA INSURANCE | § | |
| SERVICES, INC. | § | |
| | § | |
| *Defendants.* | § | |

<u>**PLAINTIFF'S ORIGINAL COMPLAINT**</u>

Plaintiff Texas Gulf Bank, N.A. ("Texas Gulf Bank") hereby files its Original Complaint against Defendants Great American Security Insurance Company ("GASIC"), Great American Alliance Insurance Company ("GAAIC"), and ABA Insurance Services, Inc. ("ABAIS") as follows:

### I.    PARTIES

1.    Plaintiff Texas Gulf Bank is a federally chartered national banking association. For purposes of 28 U.S.C. § 1348, Texas Gulf Bank has its main office in Houston, Texas.

2.    Defendant GASIC is an insurance company licensed and doing business in the state of Texas. GASIC is a corporation organized and existing under the laws of Ohio, with its principal place of business in Cincinnati, Ohio. GASIC may be served through its registered agent for service of process, United Agent Group, Inc., 5444 Westheimer Rd., Ste. 1000, Houston, Texas 77056-5318.

3.     Defendant GAAIC is an insurance company licensed and doing business in the state of Texas. GAAIC is a corporation organized and existing under the laws of Ohio, with its principal place of business in Cincinnati, Ohio. GAAIC may be served through its registered agent for service of process, United Agent Group, Inc., 5444 Westheimer Rd., Ste. 1000, Houston, Texas 77056-5318.

4.     Defendant ABAIS is a corporation organized and existing under the laws of Ohio, with its principal place of business in Shaker Heights, Ohio. ABAIS may be served through its registered agent for service of process, United Agent Group, Inc., 5444 Westheimer Rd., Ste. 1000, Houston, Texas 77056-5318.

## II.     JURISDICTION & VENUE

5.      This Court has authority under 28 U.S.C. § 1332(a) because (1) Plaintiff is not a citizen of any state for which any Defendant is a citizen; and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) & (2) because (1) Defendants are resident and subject to personal jurisdiction in this district; and (2) a substantial part of the events or omissions giving rise to the claims asserted herein took place within this district.

## III.    GASIC BREACHED ITS DUTY TO PAY THE DEFENSE COSTS & SETTLEMENT INCURRED IN CONNECTION WITH THE SEQUEIRA LAWSUIT UNDER THE CYBER POLICY

**A.    The Cyber Policy**

7.     GASIC issued Cyber Liability Policy No. CYBE417259 to Texas Gulf Bank for the period from March 16, 2021 through March 16, 2024 (the "Cyber Policy").

8.      Among other things, the Cyber Policy provides up to $5 million of coverage for Electronic Funds Transfer Liability by promising payment for "Loss resulting from Claims for Wrongful Electronic Funds Transfer Acts made against the Insured if such Claims are first made during the Policy Period" provided that the Claim "involves the transfer of funds of a Customer of the Insured with which the Insured has a Written Agreement."

9.      For purposes of this coverage, (1) "Loss" is defined to include both Defense Costs and settlements; (2) "Claim" is defined to include both a written demand for monetary damages and a civil proceeding commenced by the service of a complaint or similar pleading; (3) "Wrongful Electronic Funds Transfer Acts" is defined to include any actual or alleged error, omission, misstatement, act of negligence, or breach of duty committed in connection with an Electronic Funds Transfer Act, *i.e.*, the transfer of funds from a Customer's account through a Computer System operated by the Company; (4) "Customer" is defined as any natural person or entity that receives professional services directly from Texas Gulf Bank; (5) "Computer System" means (a) any computer with related peripheral components; (b) any electronic processing, storage or communication device; (c) any network or operating system; and (d) any tablet or smart phone; and (6) "Written Agreement" means a document signed by a Customer that (a) authorizes Texas Gulf Bank to rely on instructions received through an Electronic/On-Line Communication or email to make transfers from the Customer's account to another account; (b) has provided Texas Gulf Bank with the names of persons authorized to initiate such transfers, and the transfer at issue was initiated by someone purporting to be an authorized person; and (c) establishes the instruction verification mechanism to be used by the Insured for all such transfers.

10.     Incorporating these definitions, the Cyber Policy promises payment for Defense Costs and settlements resulting from demands and civil proceedings initiated during the policy

period for any actual or alleged negligent acts or omissions committed in connection with the transfer of funds from a customer's account through a computer network or system operated by Texas Gulf Bank, provided that the proceeding involves a customer with whom Texas Gulf Bank has a Written Agreement, as that term is defined in the Cyber Policy.

11.    Specifically with regard to Defense Costs, the Cyber Policy provides, in relevant part, that GASIC, "if requested by the Insured, will advance covered Defense Costs on a current basis …."

**B.    The Sequeira Lawsuit**

12.    On October 27, 2023, Sequeira Civil Construction, LLC ("SC2") filed its Original Petition against Texas Gulf Bank in the 11th Judicial District Court of Harris County, Texas (the "Sequeira Lawsuit").

13.    In the Sequeira Lawsuit, SC2 alleged that Texas Gulf Bank erred in making unauthorized wire transfers from SC2's account in violation of a Wire Transfer Agreement, as follows in relevant part:

- "This case arises from four unauthorized wire transfers made against SC2's accounts at Texas Gulf Bank due to Texas Gulf Bank's failure to follow the agreed security protocol in the parties' Wire Transfer Agreement and banking industry and cybersecurity industry guidance (set out below) regarding hallmarks for identifying fraudulent wire transfer requests. Texas Gulf Bank would have identified the wire transfer requests as fraudulent had it followed the agreed security protocol in the Wire Transfer Agreement." Orig. Pet., at ¶ 8.

- "On June 1, 2022, SC2 and Texas Gulf Bank entered into a Wire Transfer Agreement, which specified a process that both parties would follow to transmit and verify wire transfer requests from SC2's accounts at Texas Gulf Bank." Orig. Pet., at ¶ 9.

- "The Wire Transfer Agreement requires SC2 to identify Authorized Representatives in the form of Attachment A, a form created and maintained by Texas Gulf Bank. That Attachment requires a name, a telephone number, and the title for each Authorized Representative. SC2 identified Bartlett Sequeira as its only Authorized Representative, listing his title and a single telephone number." Orig. Pet., at ¶ 10 (citations omitted).

- "The Wire Transfer Agreement states that for each wire transfer execution, Texas Gulf Bank must contact an Authorized Representative of SC2 'by phone or in person to authenticate instructions received by such means as fax, mail, telex or electronic mail.' Each such authentication was to also include the verbal recitation of a password of the Authorized Representative's choice." Orig. Pet., at ¶ 11 (citations omitted).

- "Since the Wire Transfer Agreement became effective, SC2 submitted wire transfer requests to Texas Gulf Bank through email communications from its employee Beth Behenna. In each case Texas Gulf Bank, as part of the wire transfer verification procedure, called the Authorized Representative Mr. Sequeira on the phone number listed in the Wire Transfer Agreement to authenticate such requests by confirming his password and obtaining his approval." Orig. Pet., at ¶ 13.

- "In or about July 2023, a cybercriminal compromised Ms. Behenna's email account. The unauthorized cybercriminal gained the ability to send and receive emails from her account without her knowledge and took steps to hide its fraudulent activity from Ms. Behenna. Beginning on August 3, 2023, over a period of five days, the cybercriminal

sent Texas Gulf Bank four unauthorized fraudulent wire transfer request emails from Ms. Behenna's email account." Orig. Pet., at ¶ 14.

- "The cybercriminal emailed the first fraudulent wire transfer request on August 3, 2023 for $297,400, designating as the beneficiary Washington State lawyer Lance L. Lee, with whom SC2 had no relationship. The wire transfer request email listed a telephone number for Mr. Sequeira different from the one in the Wire Transfer Agreement, which is the telephone number SC2 listed in all wire transfer requests both before and after the Wire Transfer Agreement became effective." Orig. Pet., at ¶ 15.

- "The fraudulent wire transfer requests began one day after SC2 had submitted an authorized wire transfer request that contained the same trusted telephone number as in the Wire Transfer Agreement, as had all previous wire transfer requests from SC2. Texas Gulf Bank cannot claim that the change the following day in the telephone number in the fraudulent wire transfer requests was not a suspicious change that demanded Texas Gulf Bank follow precisely the procedure in the Wire Transfer Agreement. Yet, Texas Gulf Bank did not follow the Wire Transfer Agreement. Instead, through grossly negligent conduct, Texas Gulf Bank did not call SC2's Authorized Representative on the trusted number, but instead called the telephone number listed in the emailed wire transfer request and processed the wire to Lee. Texas Gulf Bank was later able to recall this wire it wrongfully sent without authorization from SC2's Authorized Representative and return the funds to SC2's account." Orig. Pet., at ¶ 17.

- "The cybercriminal emailed three more fraudulent wire transfer requests from Ms. Behenna's email account dated August 4, 2023, August 7, 2023, and August 8, 2023,

totaling $2,374,010, designating the same fraudulent telephone number for the Authorized Representative and identifying the beneficiary as Lomaic ICT y Software SA DE CV ('Lomaic'), a company in Mexico. Given the Wire Transfer Agreement's instruction that Texas Gulf Bank should not expect international wire transfer requests from SC2, this should have been a second giant red flag to Texas Gulf Bank to carefully follow the Wire Transfer Agreement's wire verification procedures. But again, for the August 4th and August 7th wire transfer requests, in violation of the Wire Transfer Agreement and ignoring all industry guidance, Texas Gulf Bank in another grossly negligent act called the fraudulent telephone number listed in the wire transfer request. Texas Gulf Bank processed those two requests and wired Lomaic a total of $1,481,540 from SC2's account. Such a large transfer from a small business wrongfully siphoned SC2's working capital." Orig. Pet., at ¶ 18.

14.    The "Wire Transfer Agreement" referenced in the Sequeira Lawsuit qualifies as a "Written Agreement" as that term is defined in the Cyber Policy because the Sequeira Lawsuit alleges that (1) the Wire Transfer Agreement was entered into between Texas Gulf Bank and SC2, Orig. Pet., at ¶ 8; (2) the Wire Transfer Agreement authorized Texas Gulf Bank to receive instructions for wire transfers from SC2's account via email correspondence from Beth Behenna, Orig. Pet., at ¶ 13; (3) the Wire Transfer Agreement identified Bart Sequeira as the Authorized Representative, who was empowered to authenticate wire transfers from SC2's account, Orig. Pet., at ¶¶ 10-11; (4) the wire transfers at issue were initiated by someone purporting to act on behalf of an Authorized Representative, Orig. Pet., at ¶ 14; and (5) the Wire Transfer Agreement included a procedure for authenticating wire transfer requests from SC2, whereby Texas Gulf Bank

contacted the Authorized Representative, who authenticated the wire transfer requests with the recitation of a password. Orig. Pet., at ¶¶ 9, 11, 13.

15.     Prior to the filing of the Sequeira Lawsuit, on or about September 11, 2023, SC2 issued a demand to Texas Gulf Bank reciting similar allegations to those reflected in SC2's Original Petition and seeking payment for the $1.48 million in unauthorized wire transfers made the subject of the Sequeira Lawsuit (the "Claim").

16.     The Sequeira Claim and the Sequeira Lawsuit both trigger the Cyber Policy's coverage for Electronic Funds Transfer Liability because, as indicated by the allegations excerpted above, the Sequeira Claim is a written demand for damages and the Sequeira Lawsuit is a civil proceeding, both initiated during the period of the Cyber Policy, which allege negligent acts purportedly committed in connection with the transfer of funds from SC2's account through a "Computer System" operated by Texas Gulf Bank, and SC2 is a customer with whom Texas Gulf Bank has a Written Agreement.

## C.     Texas Gulf Bank's Claim Under The Cyber Policy

17.     Texas Gulf Bank provided timely notice of SC2's Claim and the Sequeira Lawsuit to GASIC under the Cyber Policy.

18.     On October 12, 2023, ABAIS, acting on behalf of GASIC, issued a letter to Texas Gulf Bank refusing coverage for the Sequeira Claim.

19.     ABAIS did not dispute that the Wire Transfer Agreement qualified as a "Written Agreement" under the Cyber Policy. Nor did ABAIS deny the fact that the Cyber Policy's Electronic Funds Transfer Liability insuring agreement was triggered by the Claim. Rather, ABAIS admitted that Texas Gulf Bank "had a Written Agreement with the Customer [SC2] that satisfied the conditions precedent to coverage under Insuring Agreement B."

20.     Instead, ABAIS maintained that the Cyber Policy's "Non-Company Security Breach Exclusion" barred coverage. This exclusion provides as follows:

> The Insurer will not be liable to make any payment for Loss, Regulatory Correction Expense, Public Relations Expense, or Privacy Breach Response Expense in connection with any Claim, Privacy Breach Incident, or Denial of Service Attack arising out of, or in any way involving, a breach of any computer system or any communication network, other than the Company's Computer System. The Insurer also will not be liable to make any payment for Loss, Regulatory Correction Expense, Public Relations Expense, or Privacy Breach Response Expense in connection with any Claim, Privacy Breach Incident, or Denial of Service Attack in any way relating to the unauthorized access to, or use of, login, password, access key, or other Confidential Information where such information was obtained from the Customer, or any other means under the Customer's control, regardless of whether the information was obtained through theft, trick, artifice, fraud, or false pretenses.

21.     In relying on the Non-Company Security Breach Exclusion, ABAIS assumed, without any investigation, analysis or explanation, that the compromise of SC2's email account, as alleged in the Sequeira Claim and the Sequeira Lawsuit, constitutes a "breach of any computer system or communication network that is not the Bank's Computer System."

22.     In violation of Texas' eight corners rule, ABAIS also looked beyond the actual allegations in the Sequeira Claim or the Sequeira Lawsuit to justify its denial of coverage by asserting that an August 14, 2023 email referenced a compromised email password.

23.     ABAIS stated that Texas Gulf Bank is "fully responsible for all the fees and costs of defending itself in this action and resolving the dispute, either by settlement or judgment."

24.     On October 26, 2023, Texas Gulf Bank responded to ABAIS and GASIC by, among other things, (1) explaining that the compromise of the SC2 email account alleged in the Sequeira Claim and the Sequeira Lawsuit is not the same as the breach of a "computer system or communication network" for purposes of the Non-Company Security Breach Exclusion; (2)

pointing out that the Sequeira Claim does not allege that the password or PIN used to authenticate wire transfer requests was obtained from SC2 or any other means under SC2's control.

25.     Notwithstanding these facts, ABAIS, on behalf of GASIC, responded on January 26, 2024 by affirming the decision to refuse coverage under the Cyber Policy.

26.     Texas Gulf Bank and SC2 mediated the Sequeira Lawsuit on May 22, 2025.

27.     In anticipation of this mediation, Texas Gulf Bank urged GASIC to make funds available to resolve the Sequeira Lawsuit, but ABAIS, on behalf of GASIC, refused.

28.     Ultimately, Texas Gulf Bank paid $787,500 to settle the Sequeira Lawsuit, which GASIC has failed and refused to indemnify under the Cyber Policy.

29.     GASIC's failure to defend or indemnify Texas Gulf Bank in connection with the Sequeira Lawsuit has caused Texas Gulf Bank substantial damages.

## IV.     GAAIC BREACHED ITS DUTY TO PAY LOSS ARISING FROM THE SETTLEMENT OF THE SEQUEIRA LAWSUIT UNDER THE BOND

### A.     The Financial Institution Bond

30.     GAAIC issued Financial Institution Bond No. F24E417258 to Texas Gulf Bank for the period from March 16, 2021 through March 16, 2024 (the "Bond").

31.     The Bond includes a Computer Fraud Rider, which includes coverage for Funds Transfer Fraud. Specifically, under the Funds Transfer Fraud Insuring Agreement, GAAIC agreed to indemnify Texas Gulf Bank for up to $5 million of "Loss resulting directly from an Employee transferring funds from a customer's account using any Computer System or Network enumerated in (a), (b) or (c) above, while acting in good faith and reliance upon a fraudulent instruction transmitted or received … (e) through an email and which instruction purports and reasonably appears to have originated from a customer of the Insured, another financial institution, or another office of the Insured but, in fact, was not originated by the customer or entity whose identification

it bears and contains the name of a person authorized to initiate such transfer; provided that … (i) the customer is an entity or individual which has a Written Agreement with the Insured authorizing the Insured to transfer Funds from the customer's account to the account of another; and (ii) if the transfer was in excess of $100,000, the instruction was verified by an Authentication procedure set forth in the Written Agreement."

32.    For purposes of this insuring agreement, (1) a Computer System means computers with related peripheral components, including storage components wherever located, systems and applications software, and terminal devices and related communication networks by which Electronic Data are electronically collected, transmitted, processed, stored and received; (2) a Network means a group of Computer Systems that are linked together through communication technology for the purpose of allowing the transfer of information into or out of the Insured's Computer System, including an automated interbank communication system such as Fedwire, Clearing House Interbank Payment System (CHIPS), or Society for Worldwide Interbank Financial Telecommunication (SWIFT); (3) Authentication means an instruction verification procedure in which the Insured requests and receives confirmation from a customer as to the validity of an instruction the Insured received to transfer Funds, through a call back to a Predetermined Telephone Number; (4) Predetermined Telephone Number means a telephone number agreed upon by the Insured and customer, other financial institution, automated clearing house, or other office of the Insured as applicable to the transfer at hand, for the purpose of protecting the integrity of a funds transfer instruction received from such customer, other financial institution, automated clearing house, or other office of the Insured by voice, fax, email or Electronic/On-Line communication; and (5) a Written Agreement means a document signed by the customer which (i) authorizes the Insured to rely on instructions received through email to

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                              11

make transfers from that customer's account to another account; (ii) has provided the Insured with the names of persons authorized to initiate such transfers and the transfer at issue was purportedly initiated by an authorized person; and (iii) establishes the instruction verification mechanism to be used by the Insured for all such transfers.

33.    Incorporating the relevant definitions, GAAIC agreed in the Bond to indemnify Texas Gulf Bank for losses resulting from an employee transferring funds from a customer's account using an automated interbank communication system while acting in good faith and in reliance on a fraudulent instruction received by email, which purports and reasonably appears to have originated from the customer, but in fact was not originated by the customer; provided that (1) the customer has a Written Agreement with Texas Gulf Bank, which authorizes Texas Gulf Bank to rely on email instructions from authorized persons to make transfers from the customer's account and establishes the mechanism for verifying transfer instructions; and (2) for transfers greater than $100,000, the instruction was confirmed using the verification procedure—a call back to a telephone number agreed upon by Texas Gulf Bank and the customer—set forth in the Written Agreement.

34.    The Bond does not require that the Written Agreement specify the Predetermined Telephone Number in the agreement itself. All that is required is that (1) the Written Agreement establish the instruction verification mechanism and set forth the Authentication procedure; and (2) Texas Gulf Bank and SC2 agree in some form on a telephone number for verification of wire transfer requests.

**B.    The Wire Transfer Agreement & The SC2 Wires**

35.    In June 2022, Texas Gulf Bank entered into a Wire Transfer Agreement with SC2.

36.     Under the terms of the Wire Transfer Agreement, SC2 authorized Texas Gulf Bank to transfer funds from SC2's accounts in response to instructions provided by an authorized representative, whether "orally, in writing, electronically or by other means, including telephone, facsimile, telex, transmission of electronic files, or inter-computer telecommunications."

37.     The Wire Transfer Agreement identifies Mr. Bart Sequeira as an authorized representative of SC2.

38.     The Wire Transfer Agreement also includes a wire transfer instruction verification procedure to be used by Texas Gulf Bank for all wire transfer requests. Under the Wire Transfer Agreement, "[e]ach Authorized Representative must be assigned a unique password to be used to authenticate wire transfer instructions," and "[b]ecause a password must be recited to authenticate any wire transfer instructions, one of Customer's [Sequeira's] Authorized Representatives must be contacted by phone or in person to authenticate instructions received by such means as fax, mail, telex, or electronic mail."

39.     The Wire Transfer Agreement does not specify or require a specific contact number—only that the Authorized Representative "must be contacted by phone" to authenticate wire transfer instructions.

40.     Nor does the Wire Transfer Agreement specify the procedure for changing the agreed telephone number to be used for confirming wire transfer instructions.

## C.     The Fraudulent Wire Transfers

41.     On August 3, 2023, Texas Gulf Bank's Wire Department received an email purporting to be from Beth Behenna at SC2, which (1) attached a wire transfer request; and (2) proposed a new contact number for Mr. Sequeira, who was purportedly isolating after contracting a new COVID variant.

42.      Based on this representation, the Wire Department, acting on behalf of Texas Gulf Bank, agreed upon the call-back number as applicable to the wire transfer request. The Wire Department attempted to contact Mr. Sequeira at the agreed upon number, and the person responding to the call, purporting to be Mr. Sequeira, provided the password used to authenticate wire transfers.

43.      In good faith reliance on the password verification provided by the individual purporting to be Mr. Sequeira, Texas Gulf Bank's Wire Department executed the transfer as instructed.

44.      Texas Gulf Bank's Wire Department received subsequent wire transfer requests via email correspondence purporting to be sent by Beth Behanna at SC2 on August 4 and August 7, 2023.

45.      Each time, the individual posing as Beth Behanna and purporting to act on behalf of Mr. Sequeira proposed a call-back number for Mr. Sequeira to verify the wire transfer requests. Relying in good faith on this representation, the Wire Department, acting on behalf of Texas Gulf Bank, agreed upon the call-back number as applicable to the subject transfers. The Wire Department attempted to contact Mr. Sequeira at the agreed upon number, and the person responding to the call, purporting to be Mr. Sequeira, provided the password used to authenticate wire transfers.

46.      In good faith reliance on the password verification provided by the individual purporting to be Mr. Sequeira, Texas Gulf Bank's Wire Department executed the transfers requested on August 4 and August 7, 2023 as instructed.

47.      Collectively, Texas Gulf Bank transferred $1,778,940 from SC2's accounts based on the above-referenced fraudulent wire transfer instructions and verifications.

48.     Texas Gulf Bank was able to recover and return $297,400 to SC2's account, but the remaining $1,481,540 in fraudulent wire transfers was unrecoverable by Texas Gulf Bank.

49.     On September 9, 2023, SC2 issued a demand to Texas Gulf Bank seeking payment for the $1,481,540 transferred from its account.

50.     As detailed above, SC2 ultimately filed the Sequeira Lawsuit against Texas Gulf Bank in October 2023.

51.     In May 2025, Texas Gulf Bank and SC2 reached an agreement to resolve the Sequeira Lawsuit, whereby Texas Gulf Bank paid SC2 $787,500 in exchange for the release and dismissal SC2's claims against it.

**D.     Texas Gulf Bank's Claim Under The Bond**

52.     Texas Gulf Bank provided notice of its claim under the Bond at or about the same time that it provided notice of SC2's Claim under the Cyber Policy in 2023.

53.     Notwithstanding the fact that GAAIC had notice of Texas Gulf Bank's claim under the Bond in 2023, GAAIC did not respond substantively to this claim until 2025, allegedly on the basis that Texas Gulf Bank had not submitted a "Proof of Loss."

54.     When ABAIS finally did respond on behalf of GAAIC to Texas Gulf Bank's claim under the Bond on April 28, 2025, even without a formal Proof of Loss, ABAIS refused coverage.

55.     Specifically, on behalf of GAAIC, ABAIS did not dispute the fact that the Wire Transfer Agreement qualifies as a "Written Agreement" as that term is defined in the Bond. ABAIS did not dispute the fact that Texas Gulf Bank transferred funds from SC2's account in good faith reliance on fraudulent instructions received via email, which purported and reasonably appeared to have originated with SC2 for purposes of the Funds Transfer Fraud Insuring Agreement in the Bond.

56.     Instead, ABAIS asserted that (1) "[a]lthough the Bank called the fraudster to confirm the transfers and were provided with the customer's pin number, the transfers were not verified by an Authentication procedure set forth in a Written Agreement as required by subsection (ii) of the Funds Transfer Fraud Insuring Agreement"; and (2) "[t]he callback that the Bank performed does not satisfy this requirement as those callbacks were not made to a Predetermined Telephone Number established by the customer and the Bank in a Written Agreement."

57.     By taking this position, ABAIS and GAAIC have erroneously assumed that the Bond requires the Predetermined Telephone Number, as opposed to the Authentication procedure requiring verification to be made through an otherwise agreed upon telephone number, to be set forth in the Written Agreement. The Bond does not include such a requirement.

58.     ABAIS and GAAIC have misrepresented the terms of the Bond.

59.     By building its coverage denial on a false interpretation of the Bond's terms, ABAIS and GAAIC have (1) refused coverage without conducting a reasonable investigation of Texas Gulf Bank's claim under the Bond; and (2) refused coverage without providing a reasonable explanation of the basis in the Bond for GAAIC's denial of Texas Gulf Bank's claim.

60.     ABAIS's and GAAIC's improper denial of coverage for Texas Gulf Bank's claim under the Bond has caused Texas Gulf Bank substantial damages.

## V.     CAUSES OF ACTION

### A.     Breach of Contract (GASIC)

61.     The foregoing allegations are incorporated herein by reference.

62.     The Cyber Policy is a valid and enforceable contract.

63.     Texas Gulf Bank is an insured with standing under the Cyber Policy.

64.    Texas Gulf Bank has satisfied all conditions precedent to coverage under the Cyber Policy. Alternatively, GASIC has waived conditions precedent to coverage under the Cyber Policy.

65.    The terms of the Cyber Policy and the allegations in the underlying Sequeira Claim and Sequeira Lawsuit unambiguously require GASIC to pay Texas Gulf Bank's Defense Costs under the Cyber Policy.

66.    Alternatively, the terms of the Cyber Policy and/or the allegations in the underlying Sequeira Claim and Sequeira Lawsuit are ambiguous and must be construed in favor of coverage.

67.    GASIC breached the Cyber Policy by failing and refusing to pay Texas Gulf Bank's Defense Costs in connection with the Sequeira Claim and the Sequeira Lawsuit.

68.    GASIC's breach of its obligation to pay Texas Gulf Bank's Defense Costs in connection with the Sequeira Claim and the Sequeira Lawsuit has caused Texas Gulf Bank substantial damages.

69.    The terms of the Cyber Policy and the actual facts relating to Texas Gulf Bank's liability in the underlying Sequeira Lawsuit unambiguously require GASIC to indemnify Texas Gulf Bank for its settlement of the Sequeira Lawsuit under the Cyber Policy.

70.    Alternatively, the terms of the Cyber Policy are ambiguous and must be construed in favor of coverage.

71.    GASIC breached the Cyber Policy by failing and refusing to indemnify Texas Gulf Bank in connection with the settlement of the Sequeira Lawsuit.

72.    GASIC's breach of its obligation to indemnify Texas Gulf Bank in connection with the settlement of the Sequeira Lawsuit has caused Texas Gulf Bank substantial damages.

**B.    Breach of Contract (GAAIC)**

73.    The foregoing allegations are incorporated herein by reference.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                              **17**

74.     The Bond is a valid and enforceable contract.

75.     Texas Gulf Bank is an insured with standing under the Bond.

76.     Texas Gulf Bank has satisfied all conditions precedent to coverage under the Bond. Alternatively, GAAIC has waived conditions precedent to coverage under the Bond.

77.     The terms of the Bond unambiguously require GAAIC to pay Texas Gulf Bank's loss relating to the above-referenced funds transfer fraud involving SC2 under the Bond.

78.     Alternatively, the terms of the Bond are ambiguous and must be construed in favor of coverage.

79.     GAAIC breached the Bond by failing and refusing to indemnify Texas Gulf Bank for its loss in connection with SC2's fraudulent transfers under the Bond.

80.     GAAIC's breach of its obligation to indemnify Texas Gulf Bank for its loss in connection with SC2's fraudulent transfers has caused Texas Gulf Bank substantial damages.

**C.     Chapter 542 of the Texas Insurance Code (GASIC)**

81.     The foregoing allegations are incorporated herein by reference.

82.     Texas Gulf Bank has made a claim under the Cyber Policy for a defense against the Sequeira Claim and the Sequeira Lawsuit and has satisfied all conditions under the Cyber Policy.

83.     GASIC has engaged in conduct constituting violations of Chapter 542 of the Texas Insurance Code by failing to fulfill its duty to pay Texas Gulf Bank's Defense Costs under the Cyber Policy in connection with the underlying Sequeira Claim and Sequeira Lawsuit.

84.     Texas Gulf Bank is entitled to the damages set forth in Section 542.060 of the Texas Insurance Code, including, in addition to the amount of the unpaid defense costs, interest at the rate of eighteen percent (18%) per annum as well as any and all other relief provided therein.

**D.**    **Breach of the Duty of Good Faith & Fair Dealing (GAAIC)**

85.    The foregoing allegations are incorporated herein by reference.

86.    GAAIC owes Texas Gulf Bank a duty of good faith and fair dealing in connection with the handling of Texas Gulf Bank's claim under the Bond.

87.    GAAIC violated its duty of good faith and fair dealing by refusing coverage for Texas Gulf Bank's claim without a reasonable basis.

88.    GAAIC's liability for Texas Gulf Bank's claim is reasonably clear.  In spite of this reasonably clear liability, GAAIC has (1) misrepresented material facts relating to the terms of the Bond; (2) failed to provide a reasonable explanation of the basis for its denial of the claim; and (3) failed to conduct a reasonable investigation of Texas Gulf Bank's claim under the Bond.

89.    Texas Gulf Bank has suffered, and will continue to suffer, actual damages as a result of GAAIC's breach of its duty of good faith and fair dealing.

90.    Texas Gulf Bank's acts and omissions in this regard, whether committed directly or through the conduct of its agents and representatives, were malicious, fraudulent and/or grossly negligent, justifying the imposition of punitive and exemplary damages.

**E.**    **Attorneys' Fees (All Defendants)**

91.    The foregoing allegations are incorporated herein by reference.

92.    Due to the actions and/or omissions of Defendants, Texas Gulf Bank has been required to retain the services of the law firm of Haynes and Boone, L.L.P. of Dallas, Texas.  Texas Gulf Bank has agreed to pay Haynes and Boone a reasonable fee for its services necessarily rendered and to be rendered in this action.

93.     Pursuant to § 38.001 of the Texas Civil Practices & Remedies Code and/or §§ 542.060 and/or 541.152 of the Texas Insurance Code, Texas Gulf Bank is entitled to an award of reasonable attorneys' fees against Defendants in an amount to be established at trial.

## VI.     NOTICE OF CLAIMS UNDER CHAPTER 541 OF THE TEXAS INSURANCE CODE (All Defendants)

94.     The foregoing allegations are incorporated herein by reference.

95.     Pursuant to § 541.154 of the Texas Insurance Code, Texas Gulf Bank hereby provides notice of its intent to pursue claims against Defendants under § 541.151 of the Texas Insurance Code by amending this suit after 60 days.

96.      Defendants have engaged in unfair or deceptive acts or practices as defined by Section 541.060 of the Texas Insurance Code.

97.     For purposes of Section 541.060(a)(1) of the Texas Insurance Code, ABAIS and GAAIC misrepresented the terms of the Bond.

98.     For purposes of Section 541.060(a)(3) of the Texas Insurance Code, Defendants each failed to promptly provide Texas Gulf Bank with a reasonable explanation of the basis in the Cyber Policy and the Bond, in relation to the facts and applicable law, for GASIC's and GAAIC's denial of coverage for Texas Gulf Bank's claims under the Cyber Policy and the Bond.

99.     For purposes of Section 541.060(a)(7) of the Texas Insurance Code, Defendants each failed to pay Texas Gulf Bank's claims without conducting a reasonable investigation with respect to such claims.

100.    As a result of Defendants' conduct, Texas Gulf Bank has suffered damages in an amount not less than $1.2 million as well as attorneys' fees in an amount not less than $50,000.

101.    Defendants have knowingly violated Chapter 541 of the Texas Insurance Code as referenced above, and, therefore, Texas Gulf Bank seeks, in addition to actual damages, court costs, and attorneys' fees, an amount not to exceed three times the amount of actual damages.

## VII.    JURY DEMAND

102.    Plaintiff hereby requests a jury trial pursuant to FED. R. CIV. P. 38.

## VIII.    PRAYER

WHEREFORE, Plaintiff Texas Gulf Bank, N.A. respectfully requests that this Court grant the following relief:

(1)    Judgment awarding Plaintiff all damages suffered as a result of Defendants' breaches of contract;

(2)    Judgment awarding Plaintiff all damages suffered as a result of GAAIC's breach of the duty of good faith and fair dealing;

(3)    Judgment awarding Plaintiff all damages suffered as a result of Defendants' violations of Chapter 541 of the Texas Insurance Code;

(4)    Judgment awarding Plaintiff all damages suffered as a result of GASIC's violation of Chapter 542 of the Texas Insurance Code;

(5)    Judgment awarding Plaintiff all reasonable and necessary attorneys' fees and expenses incurred in this matter pursuant to Chapter 38 of the Texas Civil Practice & Remedies Code and/or Chapters 541 and/or 542 of the Texas Insurance Code;

(6)    Judgment awarding Plaintiff pre-judgment and post-judgment interest in the amount allowed by law;

(7)    Judgment awarding Plaintiff all costs of court; and

(8)    Such other and further relief to which Plaintiff may be justly entitled.

Dated: September 9, 2025

Respectfully submitted,


*/s/ Micah Skidmore* _____ _____
Micah Skidmore
Texas Bar No. 24046856
micah.skidmore@haynesboone.com
**HAYNES AND BOONE, LLP**
2801 N Harwood Street, Suite 2300
Dallas, Texas 75201
Telephone:      (214) 651-5654
Telecopier:      (214) 200-0659

**ATTORNEY FOR TEXAS GULF
BANK, N.A.**